**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **THE SATANIC TEMPLE, INC.** and **ANN DOE** | **CASE NO.** 4:21-CV-00387 |
| PLAINTIFF, | |
| v. | **COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF** |
| **JOHN WILLIAM HELLERSTEDT, MD,** in his official capacity as Executive Commissioner of the **DEPARTMENT OF STATE HEALTH SERVICES**, | |
| **TEXAS DEPARTMENT OF STATE HEALTH SERVICES**, and | |
| **PLANNED PARENTHOOD CENTER FOR CHOICE, INC.** | |
| DEFENDANTS. | |

**COMES NOW** Plaintiff The Satanic Temple ("**TST**"), by and through counsel Matthew A. Kezhaya (AR # 2014161, *pro hac vice* pending) of Kezhaya Law PLC, and Brad Ryynanen (TX # 24082520), of the Ryynanen Law Office PLLC with a complaint seeking declaratory and injunctive relief.

## EXPLANATORY NOTE

1. This complaint asks for judicial review of four Texas abortion regulations through the lens of religious liberty. As further detailed below, TST and its membership holds religious beliefs and practices surrounding the abortive act which are entitled to protection from state interference under both Federal law and Texas law.

2. Ann Doe is a member of TST who intends to engage in a religious ceremony that will culminate in the abortive act. Texas abortion regulations interfere with this ceremony, which raises constitutional suspicions. As further detailed below, the regulations fail constitutional scrutiny and

fail scrutiny under the Texas Religious Freedom Restoration Act ("TRFRA.")

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this case under 28 USC § 1331 (federal question) because TST complains of alleged constitutional violations under color of state law which are actionable under 42 USC § 1983 (authorizing a cause of action for such claims) and 28 USC § 2201 (authorizing declaratory judgments), both of which are federal laws. See also Ex parte Young, 209 U.S. 123 (1908).  Under Ex parte Young, state officials, like Cecil Young, who enforce an unconstitutional law are stripped of their official character and become merely another citizen who can constitutionally be brought before a court by a party seeking injunctive relief.

4. This Court has supplemental jurisdiction over the TRFRA claim under 28 USC § 1367.  This state law claim is so related to the federal claims that it forms part of the same case or controversy.

5. Texas has expressly waived its Eleventh Amendment immunity to suit for the TRFRA claim. See TEX. CIV. PRAC. & REM. CODE § 110.008.

6. This Court has general personal jurisdiction over Defendants because they all exist or regularly conduct business within this District.  This Court has specific personal jurisdiction over Defendants because the situs of the injury sought to be avoided will take place in this District and it is reasonable to exercise jurisdiction here because the relevant facility is located within this District.

7. Venue properly lies with this Court under 28 USC § 1391(b) because the conduct complained of happened in this Court's District.

## PARTIES

8. **The Satanic Temple, Inc.**, plaintiff, (abbreviated to "**TST**") is a famous IRS-recognized atheistic religious corporation with its principal place of business in Salem, Massachusetts.  TST's membership exceeds 270,000 and was recently the subject of the acclaimed film, "Hail Satan?" (2019,

Magnolia Films).  See also <u>Satanic Temple v. City of Scottsdale</u>, No. CV18-00621-PHX-DGC, 2020 WL 587882 (D. Ariz. Feb. 6, 2020) (holding that TST is a bona fide religion).  TST's membership can be found in every state, including Texas.  TST venerates (but does not worship) the biblical adversary as a promethean icon against tyranny.  For TST and its membership, the Satan described in Paradise Lost and like works is a revolutionary antihero who stood up against impossible odds to seek justice and egalitarianism for himself and others.  TST propagates its Seven Tenets:

(1) One should strive to act with compassion and empathy toward all creatures in accordance with reason.

(2) The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions.

(3) One's body is inviolable, subject to one's own will alone.

(4) The freedoms of others should be respected, including the freedom to offend.  To willfully and unjustly encroach upon the freedoms of another is to forgo one's own.

(5) Beliefs should conform to one's best scientific understanding of the world.  One should take care never to distort scientific facts to fit one's beliefs.

(6) People are fallible.  If one makes a mistake, one should do one's best to rectify it and resolve any harm that might have been caused.

(7) Every tenet is a guiding principle designed to inspire nobility in action and thought.  The spirit of compassion, wisdom, and justice should always prevail over the written or spoken word.

https://thesatanictemple.com/pages/about-us (last visited November 11, 2020).  One of TST's religious ceremonies is the Satanic Abortion Ritual, described in detail below.  TST sues on behalf of itself and its membership, seeking a declaratory judgment that TST's membership is entitled to a

religious exemption to Texas abortion regulations whenever the regulations act as a substantial interference on the member's Satanic Abortion Ritual.

9. **Ann Doe**, plaintiff, sues anonymously because she wants to avoid the catastrophic side-effects from the controversy surrounding this case and the deeply personal nature of the subject of this dispute. Doe is a pregnant woman who resides at least 100 miles from the nearest abortion clinic, which is the Planned Parenthood Center for Choice, Inc. facility in Houston, TX. Doe is a TST member, and has been since before she became pregnant. Doe wants to participate in TST's Satanic Abortion Ritual unrestrained by the Texas regulations described below.

10. **Dr. JOHN WILLIAM HELLERSTEDT**, defendant, is the Commissioner of the Texas Department of State Health Services. Dr. Hellerstedt is being sued in his official capacity, only.

11. The **Texas Department of State Health Services**, defendant, is the Texas agency responsible for enforcing the complained-of Texas abortion regulations.

## STANDING

12. TST has direct standing because the complained-of regulations are anathema to TST's Satanic Abortion Ritual and core tenets.

13. TST also has associational standing to present the claims of other members, similarly situated to Ms. Doe, who want to participate in the Satanic Abortion Ritual but are impacted by these regulations.

14. TST's organizational purposes include litigating to protect the religious liberty rights of TST's membership. Thus, this lawsuit is germane to TST's organizational purposes.

15. Due to the cost of litigation and the short window between "unripe" abortion claims and "moot" ones, these members cannot vindicate their own rights.

16. Their participation is not "necessary" to the litigation, even though some of them may provide

evidence, because only enough participation to show a pattern is needed.  See Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd., 627 F.3d 547 (5th Cir. 2010).

17. TST thus sues, both directly and on behalf of its affected membership, for an order to require the Department to create a mechanism for seeking an exemption to these regulations insofar as they substantially interfere with the Satanic Abortion Ritual.

## FACTS ALLEGED

18. Ms. Doe is a pregnant woman and a TST member who is looking to participate in TST's Satanic Abortion Ritual but is forced to comply with certain regulations to which she has a religious objection.

## What makes TST's abortion ritual "religious"

19.  Part of this case will require proving that Ms. Doe's decision to engage in the Satanic Abortion Ritual is meaningfully different than getting a secular abortion.

20. That requires some important background on what it means to be "Satanic."

21. The following is not an invitation to litigate the truth, the reasonableness, or the centrality of the Display to TST's beliefs or practices.  E.g. Employment Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 887, 110 S. Ct. 1595, 1604 (1990) ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.")

22. TST shares with all other Satanic groups a veneration for the biblical concept *ha satan* (literally: "the adversary" or "the accuser.")

23. *Ha satan* is a description of being, not a particular individual.

24. Satanism, broadly, can be roughly divided into "nontheistic" and "theistic" groups.

25. Nontheistic Satanists venerate the concept of the Biblical Satan and may participate in ritual,

but do not literally worship the divine entity that Christians identify as "The Devil" and do not have any expectation that participating in ritual, by itself, will affect the outside world.

26. Ritual is not useless to a nontheistic Satanist, however. Ritual has a powerful, and studied, effect on the subjective experience of the participants. Hobson NM, Schroeder J, Risen JL, Xygalatas D, Inzlicht M. *The Psychology of Rituals: An Integrative Review and Process-Based Framework*. Personality and Social Psychology Review. 2018;22(3):260-284. doi:10.1177/1088868317734944.

27. TST is a nontheistic branch of Satanism. This is enshrined in TST's Fifth Tenet ("Beliefs should conform to one's best scientific understanding of the world. One should take care never to distort scientific facts to fit one's beliefs"), which posits that beliefs and actions should be guided by scientific consensus, not tradition or superstition.

28. Theistic Satanists differ from nontheistic Satanists by taking the extra step to literally worship a deity that Christians identify as "The Devil." If they participate in ritual magic, a theistic Satanist will believe that the ritual, by itself, causes an effect on objective reality.

29. Satanists–nontheistic or otherwise–believe that authority is to be rebelled against ("accused") if it is tyrannical.

30. When something becomes "tyranny" is the subject of TST's religious doctrine. Suffice it to say that TST finds the regulations at issue "tyranny."

31. This is an inversion of Christian norms, which holds that authority–particularly divine authority–is not to be questioned.

32. Another Satanic inversion of Christian norms is the balance of perceived importance between the self and the outside world.

33. To Satanists, the self should be assigned a greater importance than the outside world. This is an inversion of the Christian norm, that for example, the outside world (God and the Church) may

freely dictate the thoughts and actions of the adherents.

34. TST's membership does not subscribe to humility as a virtue and self-deprecation as a lifestyle. TST's membership does not denigrate desires and practices that they enjoy which does not harm others.

35. TST has enshrined this belief in the Third Tenet ("One's body is inviolable, subject to one's own will alone.")

36. Other common applications of bodily inviolability include a religious objection against corporeal punishment of minors, a liberal view on body modification, and unwavering acceptance of the LGBTQ+ community.

37. TST and its membership are nontheistic Satanists, with an added influence by the philosophy of the Enlightenment Thinkers.

38. The core philosophy behind TST's Satanism is in propounding those elemental propositions that—we believe—all nontheistic Satanists can agree upon: the pursuit of "justice" and "empathy" is "good" and our worldview should be determined exclusively by reason, with room to grow or change based on new evidence.

39. In this worldview, TST shares much with the Founding Fathers. This great nation began as an act of insurrection against a tyrant-king who claimed divine authority. The Founding Fathers pursued justice and egalitarianism for all. Replace George Washington with Satan, and TST's membership sees no substantive difference.

40. TST's membership holds the Founding Fathers and the Constitution in high esteem.

41. But despite holding these ideals in the highest esteem, TST makes no claim to having the "highest ideal" or "divine truth," and will vigorously defend religious freedom in its many forms.

42. This commitment to pluralism is rooted in a profound respect for the individual but is

accompanied by an unflinching demand for reciprocity.

43. As addressed above, many of TST's membership believe that ritual can have an important place in the life of its adherents.

44. Other than the Satanic Abortion Ritual, TST's membership engages in destruction rituals (ceremonious destruction of items with symbolic meaning), the Unbaptism (ceremonious casting off of religious indoctrination), various meditations and mantras, and sex magic.  See generally Shiva Honey, The Devil's Tome: A Book of Modern Satanic Ritual (Serpentīnae, March 25, 2020).

45. There are other rituals, too.  The point is that the Satanic Abortion Ritual is not an end-run around abortion regulations.

46. TST developed the Satanic Abortion Ritual to help its membership cast off guilt, shame, and mental discomfort that the member may be experiencing in connection with their election to abort the pregnancy.  See Exhibit A.

47. The Ritual also confirms the member's choice and wards off effects of unjust persecution.  Id.

48. Here, the unjust persecution is an improper effort of the State (the "outside world") to infringe on the decision-making of a member about her own health decision (the "inside world.")

49. This tension is recognized as a secular legal issue.  See <u>Planned Parenthood of Se. Pennsylvania v. Casey</u>, 505 U.S. 833, 852, 112 S. Ct. 2791, 2807, 120 L. Ed. 2d 674 (1992) (recognizing a woman's right to choose as originating from the "zone of conscience and belief.")

50. But for TST's membership (including Ms. Doe), it is more than a simple privacy interest.

51. For plaintiffs, the State's intrusion into a member's decision about their own body is a tyrant overpowering resistance to compel beliefs and actions.  It's an abuse of power.

52. Not only is it an abuse of power, but the political rhetoric surrounding abortion is notably religious.

53. So, from the perspective of a Satanist, abortion regulations place the State in the role of tyrant-king which claims divine authority to in an effort to make the Satanist feel guilt, doubt, and shame on an issue of religious significance.  This is deeply offensive to those who subscribe to the Third Tenet.

54. The Satanic Abortion Ritual was created to combat those efforts and, for TST's membership, it is empowering to assert or re-assert (as appropriate) power and control over their own mind and body.

55. To implement the Satanic Abortion Ritual, it depends on the nature of the abortion.

56. For surgical abortions:

> Immediately before receiving any anesthetic or sedation, look at your reflection to be reminded of your personhood and responsibility to yourself.  Focus on your intent, take deep breaths, and make yourself comfortable.  When you are ready, say the Third Tenet aloud.  The surgery can now begin.  During the operation, take another deep breath and recite the Fifth Tenet.  Immediately after the surgery, return to your reflection and recite the personal affirmation.  Feel the doubts dissipating and your confidence growing as you have just undertaken a decision that affirms your autonomy and free will.  The religious abortion is now complete.

**EXHIBIT A** at p. 4.

57. For medical abortions:

> Immediately before taking the medication(s) to terminate your pregnancy, look at your reflection to be reminded of your personhood and responsibility to yourself.  Focus on your intent, take deep breaths, and make yourself comfortable.  When you are ready, read the Third Tenet aloud to begin the ritual.  After swallowing the medication(s), take another deep breath and recite the Fifth Tenet.  After you have passed the embryo, return to your reflection and recite the personal affirmation.  Feel the doubts dissipating and your confidence growing as you have just undertaken a decision that affirms your autonomy and free will.  The religious abortion is now complete.

Id.

### Ms. Doe needs an exemption

58. The last day of a woman's period is used as the date to mark the beginning of pregnancy.

59. December 5, 2020 was the last day of Ms. Doe's period.

60. Ms. Doe learned that she was pregnant in early-January or mid-January, 2021.

61. After that, Ms. Doe considered her options and then resolved to abort the pregnancy.

62. Ms. Doe also resolved to use the Satanic Abortion Ritual for its intended purposes.

63. Ms. Doe lives more than 100 miles from any nearby abortion facilities.

64. The closest facility to Ms. Doe is the Planned Parenthood facility in Houston, Texas.

65. Ms. Doe reached out to the facility to arrange for her medical appointments.

66. Through the course of her communications with the facility, Ms. Doe learned of certain abortion regulations which act as an impediment to Ms. Doe being able to participate in the Ritual.

67. Ms. Doe takes issue with the following regulations:

    (a) A requirement to have a sonogram as a precondition of obtaining an abortion,

    (b) A forced decision to reject the "opportunity" of seeing the sonogram results,

    (c) The forced listening to a narrative of the sonogram results, and

    (d) A mandatory waiting period between the sonogram and receiving the abortion.

See TEX. HEALTH & SAFETY CODE § 171.012(a)(4) and (5) and TEX. HEALTH & SAFETY CODE § 171.0122.

68. Ms. Doe perceives no medical basis for Texas to require a sonogram before an abortion. See Dr. Jen Russo, "Mandated Ultrasound Prior to Abortion" *Virtual Mentor*. 2014;16(4):240-244. doi: 10.1001/virtualmentor.2014.16.4.ecas1-1404.

69. Ms. Doe objects to the sonogram requirement as violative of the Fifth Tenet.

70. There being no medical need for the sonogram, Ms. Doe objects to the related regulations

(forced rejection of the "opportunity" to see the results, the forced listening of the narrative explanation, and the mandatory waiting period) all as violative of the Fifth Tenet.

71. These requirements' sole apparent purpose is to influence some patients away from the abortion and toward childrearing. See Gatter M, Kimport K, Foster DG, Weitz TA, Upadhyay UD. Relationship between ultrasound viewing and proceeding to abortion. *Obstet Gynecol.* 2014;123(1):81-87.

72. As explained above, Ms. Doe objects as violative of the Third Tenet to these requirements' as efforts to control the decisions she makes for herself and her body.

73. Additionally, the requirement of a sonogram increases the financial cost of the abortion.

74. For Ms. Doe, the sonogram makes the abortion cost $150 more.

75. Ms. Doe has limited financial resources.

76. Ms. Doe does not want to expend her limited funds on a medical procedure which she objects to.

77. By regulating the abortive act and refusing to grant exemptions for the Satanic Abortion Ritual, the State has placed a barrier between Ms. Doe and her ceremony.

78. On January 22, 2021, Ms. Doe's religious beliefs compelled her to seek a religious exemption to these regulations: both because the regulations violate her beliefs and because they substantially interfere with the Satanic Abortion Ritual.

79. The facility refused to grant it.

80. Neither Ms. Doe nor TST fault the facility.

81. As written, the regulations do not provide for religious exemptions.

82. If the facility granted Ms. Doe a religious exemption, the facility would incur sanctions from the Department.

83. Through counsel, Ms. Doe issued a TRFRA demand letter to the facility and the Department. **EXHIBIT B**.

84. Neither the facility nor the Department did not grant a religious exemption.

85. Ms. Doe's appointment is on February 6, 2021.

86. Being within the first trimester, the fetus is nonviable.

87. Absent the relief prayed for below, Ms. Doe's religious objections will be overrun and her participation in the Satanic Abortion Ritual will be substantially interfered with.

## CAUSES OF ACTION

### Count 1
Hybrid Free Speech / Free Exercise claim

88. The Free Exercise Clause prohibits the Government from making a law "prohibiting the free exercise" of religion. U.S. Const. amend. I; see also <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940) (the First Amendment prohibition is applicable to the States as incorporated into the Fourteenth Amendment).

89. The Free Speech Clause prohibits the Government from "abridging the freedom of speech." Id.

90. The First Amendment, which includes the Free Speech and Free Exercise Clauses, was drafted to protect against political division along religious lines. <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 622, 91 S. Ct. 2105, 2116, 29 L. Ed. 2d 745 (1971).

91. To that end, the Free Exercise Clause prohibits governmental restraint on the free exercise of religion. U.S. Const. Amend. I ("Congress shall make no law . . . prohibiting the free exercise [of religion]"); <u>Braunfeld v. Brown</u>, 366 U.S. 599, 607, 81 S. Ct. 1144, 1148 (1961) ("If the purpose *or effect* of a law is to . . . discriminate invidiously between religions, that law is constitutionally invalid even

though the burden may be characterized as being only indirect") (emphasis added); see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534, 113 S. Ct. 2217, 2227, 124 L. Ed. 2d 472 (1993) ("Facial neutrality is not determinative.")

92. Likewise, the Free Speech Clause prohibits governmental suppression of expression–particularly to include religious expression. Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 760 (1995) ("government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince.") (emphasis in original)

93. By officiating the Satanic Abortion Ritual, Ms. Doe (and TST's similarly situated members) will be uttering religiously charged speech and will be engaging in religious conduct.

94. Texas places barriers between Ms. Doe (and TST's similarly situated members) and this religious speech and conduct by first requiring she undergo a medically unnecessary operation, requiring she reject the "opportunity" to see the results of the imaging, requiring she listen to the narrative of and results of the imaging, and requiring she wait.

95. As applied to Ms. Doe (and TST's similarly situated members), these regulations are constitutionally suspect barriers between an officiant and their religious speech and conduct.

96. Therefore, the complained-of regulations are constitutionally suspect and must survive strict scrutiny under Braunfield.

97. Pursuant to 42 USC § 1983 and 28 USC § 2201, the Court should declare these regulations unconstitutional as applied to Ms. Doe and TST's similarly situated members because they "abridge" or "prohibit the free exercise" of religious speech and conduct.

98. The Court should issue permanent injunctions (1) barring the Department from enforcing this regulation in a manner that interferes with TST's Satanic Abortion Ritual and (2) requiring the

Department to develop a mechanism to accommodate TST's Satanic Abortion Ritual. 42 USC § 1983 (authorizing injunctive relief).

## Count 2
Equal Protection

99. The Fourteenth Amendment prohibits Texas from disparately treating similarly situated classes of people. Plyler v. Doe, 457 U.S. 202, 216-17, 102 S. Ct. 2382, 2394 (1982); see also U.S. Const. Amend. XIV ("nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws.")

100. When a regulation disadvantages a suspect class or the exercise of a fundamental right, like the free exercise of religion, the regulation is presumptively unconstitutional and must be justified by a showing that the regulation is precisely tailored to a compelling governmental interest. Id.

101. Or, when "important but not fundamental" rights are impacted, the governmental regulation must be justified by a showing of a substantial interest which is closely related to the regulation. Id.; see also District of Columbia v. Heller, 554 U.S. 570 at fn. 27 (2008) (rejecting the rational basis test because, otherwise, constitutional guarantees would be "redundant with the separate constitutional prohibition on irrational laws.")

102. At issue under this count is the "narrative" regulation. TEX. HEALTH & S § 171.0122(d).

103. The "narrative" regulation delineates between two classes of pregnant women who don't want to listen to the narrative of the result:

104. On the one hand: victims of a sexual crime, minors with a judicial bypass, and women pregnant with a fetus with an irreversible medical condition or abnormality; and

105. All other pregnant women, importantly to include those who intend to participate in

TST's Satanic Abortion Ritual.

106. Both are similarly situated in that they are pregnant and don't want to listen to the narrative of the result.

107. But the regulation only permits the former camp to reject the narrative.

108. The latter camp must suffer through the explanation.

109. This regulation must survive strict scrutiny. It impacts the fundamental right of free exercise of religion because Ms. Doe and TST's similarly situated members intend to participate in the Satanic Abortion Ritual without first listening to the narrative.

110. Alternatively, it must survive intermediate scrutiny because it impacts the Fourteenth Amendment's right to choose.

111. Pursuant to 42 USC § 1983 and 28 USC § 2201, the Court should declare this regulation unconstitutional as applied to Ms. Doe and TST's similarly situated members because it fails to accommodate a religious exemption.

112. The Court should issue permanent injunctions (1) barring the Department from enforcing this regulation in a manner that interferes with TST's Satanic Abortion Ritual and (2) requiring the Department to develop a mechanism to accommodate TST's Satanic Abortion Ritual. 42 USC § 1983 (authorizing injunctive relief).

### Count 3
Violation of Casey

113. The Fourteenth Amendment prohibits Texas from enacting an "undue burden" on a nonviable fetus, i.e. an "a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Planned Parenthood of Se. Pennsylvania v. Casey, 505 U.S. 833, 877, 112 S. Ct. 2791, 2820, 120 L. Ed. 2d 674 (1992); see also U.S. Const. amend XIV § 1 ("nor shall any State deprive

any person of life, liberty, or property, without due process of law").

114. By requiring a sonogram before Ms. Doe can get an abortion, the State has imposed an "undue burden" on Ms. Doe's decision to seek an abortion of a nonviable fetus.

115. The financial requirement attending the sonogram is an "undue burden." Cf. Texas Med. Providers Performing Abortion Servs. v. Lakey, 667 F.3d 570, 576 (5th Cir. 2012) (the Fifth Circuit has held that the sonogram, itself, is not an undue burden but did not address the financial costs of the sonogram).

116. Pursuant to 42 USC § 1983 and 28 USC § 2201, the Court should declare the sonogram requirement unconstitutional as applied to Ms. Doe and TST's similarly situated members because it incurs an additional financial cost to the abortion.

117. The Court should issue either of two permanent injunctions: (1) the Department is barred from enforcing this regulation; or (2) the Department shall pay all costs of the sonogram for Ms. Doe and TST's similarly situated members. 42 USC § 1983 (authorizing injunctive relief).

## Count 4
Violation of TRFRA

118. To some extent, the constitutional issues will need to overcome Employment Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 110 S. Ct. 1595 (1990) (holding that generally applicable rules that only impact free exercise, unaccompanied by evidence of an intention to prohibit religious practices, need not survive strict scrutiny).

119. Texas encoded the Texas Religious Freedom Restoration Act in response to Smith. See TEX. CIV. PRAC. & REM.CODE § 110.001 et seq. ("TRFRA").

120. Under TRFRA, it is irrelevant that the regulations at issue are generally applicable and it is irrelevant whether the regulations were motivated by religious discrimination. The applicable

questions are (1) whether any of the regulations are a "substantial interference" with the free exercise of religion; and (2) if so, whether the regulations can survive strict scrutiny.

121. Plaintiffs expect an argument that TST's Satanic Abortion Ritual cannot "really" be religious because other people engage in secular abortions.

122. The Texas Supreme Court has already resolved this argument in favor of TST. <u>Barr v. City of Sinton</u>, 295 S.W.3d 287, 300 (Tex. 2009) ("the fact that a halfway house can be secular does not mean that it cannot be religious.")

123. The regulations are a substantial interference with Ms. Doe's and TST's similarly situated members because they place hurdles in front of religious speech and religious conduct. The State might as well tax and regulate the act of prayer.

124. The State must raise and prove a compelling interest and how the regulation is precisely tailored to it.

125. Plaintiffs issued appropriate demand correspondence before filing this lawsuit. Exhibit B.

126. The governmental infringement of Ms. Doe's–and, by association, TST's–religious liberty is "imminent" because Ms. Doe's religious objections will be overrun on February 6, 2021. Thus, the 60 day waiting period does not apply. See TEX. CIV. PRAC. & REM.CODE § 110.006(b).

## P<small>RAYER FOR RELIEF</small>

**W**<small>HEREFORE</small> Plaintiffs pray for relief as follows.

1. The Court should declare the regulations at issue unconstitutional as applied to Ms. Doe and TST's similarly situated members.

2. The Court should issue a permanent injunction against the Department to bar enforcement of the regulations insofar as they substantially interfere with the Satanic Abortion Ritual. Id.

3. The Court should issue a permanent injunction against the Department to require the creation and enforcement of regulations that accommodate the Satanic Abortion Ritual. Id.

4. The Court should issue a temporary restraining order against the Department and the facility, as prayed for in the separate emergency motion for temporary restraining order. Id.

5. The Court should order compensation to TST for costs and attorney's fees.  42 USC § 1983 and FRCP 54.

6. And the Court should order all other relief to which it finds TST entitled.  FRCP 54(c).

Respectfully submitted,   Date:   February 5, 2021

By:   /s/ Matthew A. Kezhaya
Attorney-in-charge (*pro hac vice* pending)
Matthew A. Kezhaya, ABA # 2014161
Kezhaya Law PLC
1202 NE McClain Road
Bentonville, AR 72712
P: 479-431-6112
Email: matt@kezhaya.law

/s/ Brad Ryynanen
Brad Ryynanen
Texas Bar No. 24082520
The Ryynanen Law Office, PLLC
515 Centre Street, # 4471
Dallas, TX 75208
P: 214-972-8640
Email: brad@bdrlegal.com

## EXHIBIT LIST

A. Religious abortion ritual pamphlet

B. TRFRA demand letter